Case 5:23-cv-00017   Document 132   Filed on 11/13/25 in TXSD   Page 1 of 20

United States District Court
Southern District of Texas
**ENTERED**
November 13, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| ISMAEL RINCON | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 5:23-cv-17 |
| | § | |
| CARLOS IBARRA *et al.* | § | |

# ORDER

Plaintiff Ismael Rincon[1] brings his civil rights action under 42 U.S.C. § 1983 against three City of Laredo police officers: Officer Carlos Ibarra, Officer Gerardo Jalomo, and Sergeant Roberto Fernandez (*see* Dkt. Nos. 90; 102-1). On July 10, 2025, Officers Ibarra and Jalomo moved for summary judgment, asserting that qualified immunity bars Plaintiff's claims (*see* Dkt. No. 113). Sergeant Fernandez moved for summary judgment on July 11, 2025, also invoking qualified immunity (*see* Dkt. No. 115). Plaintiff neglected to timely oppose either motion.[2] Having carefully reviewed the parties' briefings, the uncontroverted evidence, and the applicable law, the Court **GRANTS** Officers Ibarra and Jalomo's Motion for Summary Judgment (Dkt. No. 113) and Sergeant Fernandez's Motion for Summary Judgment (Dkt. No. 115).

---

[1] Plaintiff is no stranger to the Southern District of Texas. He currently has three other pending cases against law enforcement in the Laredo division alone: *Rincon v. Martinez, III*, 5:24-cv-50 (S.D. Tex. filed Mar. 11, 2024), *Rincon v. Salazar*, 5:25-cv-23 (S.D. Tex. filed Mar. 3, 2025) and *Rincon v. Barrera*, 5:25-cv-158 (S.D. Tex. filed Sept. 23, 2025). Additionally, the Undersigned presided over *Rincon v. Elizondo, III*, 5:21-cv-45 (S.D. Tex.), where, as here, Plaintiff failed to oppose summary judgment, neglected to timely mediate the case, and repeatedly sought extensions and modifications. The Court warns Plaintiff that repeat behavior may result in consequences. *Mayfield v. Klevenhagen*, 941 F.2d 346, 348 (5th Cir. 1991) (*pro se* litigants are afforded considerable latitude, but are not given free rein to clog the judicial wheel); *Hardwick v. Brinson*, 523 F.2d 798, 800 (5th Cir. 1975) (same).

[2] After the deadline to do so had already lapsed, Plaintiff moved for an extension to respond to Defendants' motions for summary judgment (Dkt. No. 125). Finding that Plaintiff failed to demonstrate either good cause or excusable neglect, the Court denied Plaintiff's motion (*see* Dkt. No. 129).

## I.   BACKGROUND

Faced with the uncertainty of the COVID-19 pandemic, the City of Laredo implemented an Amended Public Health Emergency Order on February 1, 2021 (Dkt. No. 120 at 6, 29). The City's Order declared COVID-19 a "public health emergency," threatening "the life, health, and property of all residents of the City of Laredo" (Dkt. No. 120 at 7). To curtail the damage, the City imposed several constraints, including a curfew prohibiting Laredoans from engaging in social activities not happening at essential and non-essential businesses between 6:00 p.m. and 5:00 a.m. from February 5, 2021 through February 8, 2021 (Dkt. No. 120 at 21).

In the early morning hours of February 6, 2021, at around 1:29 a.m., Plaintiff drove a blue sedan into a vacant parking lot at a high rate of speed (Dkt. Nos. 114 at 5, 11; 122 at 29; 124(1) [Hereinafter "Fernandez BWC"] at 1:45:49–50). Officers Ibarra and Jalomo, stationed near the parking lot completing paperwork, were concerned the blue vehicle's occupant was violating the COVID-19 curfew (Dkt. No. 114 at 5–6; 11). In response, the Officers approached the vehicle on foot and began to question Plaintiff (Dkt. Nos. 114 at 5–6; 11; 7-1 [hereinafter "Plaintiff's Footage"][3] at 0:06–07).

Officer Ibarra, wearing a light blue medical mask, inquired why Plaintiff was in the parking lot (Dkt. No. 114 at 6; Plaintiff's Footage at 0:07–08). Speaking in Spanish, Plaintiff claimed he was eating (Plaintiff's Footage at 0:09–15). Officer

---

[3] Once Officers Ibarra and Jalomo conducted the traffic stop on Plaintiff's car, he "activated his special eye glasses [sic] that video and audio record" (Dkt. No. 102-1 at 4, ¶ 10). The footage taken from Plaintiff's eyewear is not in summary judgment evidence; however, the Court has discretion to "consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Because Plaintiff's footage captures the beginning of his encounter with law enforcement, the Court exercises its discretion to consider it.

2

Ibarra posed follow-up questions, which Plaintiff dodged (Plaintiff's Footage at 0:15–20). At that point, Officer Ibarra informed Plaintiff he "was in a parking lot after hours" and there was a COVID-19 curfew in effect (Plaintiff's Footage at 0:20–34). Still, Plaintiff declined to cooperate, and Officer Ibarra ordered him out of the vehicle (Plaintiff's Footage at 0:41–1:05). Concurrently, Officer Ibarra noticed Plaintiff's vehicle was stockpiled with weapons, including "several long rifles" (Dkt. No. 114 at 6; Fernandez BWC at 1:55:36–47 (Plaintiff admitted to Sergeant Fernandez that he had rifles in plain view)).

Officer Ibarra frisked Plaintiff, locating a gun holstered to his hip[4] (Dkt. No. 114 at 6). Throughout the pat-down, Officers Ibarra and Jalomo requested Plaintiff's name and driver's license, but he repeatedly refused to provide them, invoking the Fifth Amendment (Plaintiff's Footage at 1:08–2:11). Officer Ibarra next asked if Plaintiff had "any more weapons on [him]," to which Plaintiff replied: "Yes, I have plenty" (Plaintiff's Footage at 2:29–31). Officer Jalomo calmly mentioned the Officers' need for Plaintiff's license, and Plaintiff retorted: "You don't, you don't need a license" (Plaintiff's Footage at 2:38–:41).

The footage cuts to Officer Ibarra searching Plaintiff's car, specifically the driver's seat, passenger's seat, and backseat areas (Plaintiff's Footage at 2:43–3:13). Plaintiff verbally protested, advising Officer Ibarra that the curfew violation does not furnish probable cause to search and instructing him to "talk to your sergeant" (Plaintiff's Footage at 2:49–3:13). Officer Jalomo escorted Plaintiff to a patrol car,

---

[4] Later, law enforcement determined that this weapon was a pellet gun (Fernandez BWC at 1:49:38–57).

3

telling him—for the first time—that he is under arrest (Plaintiff's Footage at 3:11–18). Seemingly shocked by this news, Plaintiff asked about the charges, and Officer Jalomo said they will soon explain them to Plaintiff (Plaintiff's Footage at 3:18–23). When Officer Jalomo again requested Plaintiff's identification, Plaintiff repeatedly shouted, "38.02," referencing the Texas statute governing failure to identify[5] (Plaintiff's Footage at 3:38–4:02).

At 1:33 a.m., Officer Alex Leal arrived on the scene (Dkt. No. 124(2) [Hereinafter "Leal BWC"] at 1:33:06). He approached Plaintiff's vehicle, illuminated the backseat with a flashlight, and observed what appears to be a long, black rifle (Leal BWC at 1:33:15–25). He replicated this exercise in the passenger's seat (Leal BWC at 1:33:28–33). After doing a half-circle around the car, Officer Leal again shined his flashlight into the backseat, exposing two firearms (pictured below):



---

[5] Texas Penal Code 38.02(a) reads: "A person commits an offense if he intentionally refuses to give his name, residence address, or date of birth to a peace officer who has *lawfully arrested* the person and requested the information." *See also Sauceda v. City of San Benito*, 78 F.4th 174, 186 (5th Cir. 2023) (citing § 38.02(a)). The provision has since been amended to criminalize a motor vehicle operator's failure to provide a driver's license upon lawful detention and upon request by law enforcement. § 38.02(b-1).

(Leal BWC at 1:33:51–52). Within Officer Leal's field of vision, officers open Plaintiff's trunk (Leal BWC at 1:37:43). Officer Leal then removed a notepad from his person and began inventorying the items in Plaintiff's vehicle (Leal BWC at 1:37:55–1:39:11).[6] At one point, an officer extracted and inspected a large, black rifle (Leal BWC at 1:38:28–33).

Sergeant Fernandez arrived at 1:45 a.m., and Officer Ibarra immediately greeted him (Fernandez BWC at 1:45:43). After Sergeant Fernandez assessed Plaintiff's car, an officer explained that a "couple" of Plaintiff's weapons were loaded, including a shotgun, a handgun, and a .22 rifle (Fernandez BWC at 1:48:13–31). Officer Jalomo then approached Sergeant Fernandez; Officer Jalomo recounted how he described the COVID-19 curfew to Plaintiff, but Plaintiff was wholly uncooperative (Fernandez BWC at 1:48:50–1:49:26). In response, Sergeant Fernandez advised Officers Jalomo and Ibarra to "make sure [they] cite for" the COVID-19 violation (Fernandez BWC at 1:49:28–29).

Roughly five minutes later, Sergeant Fernandez approached Plaintiff, who told him he had stopped to eat a snack because his blood sugar was low (Fernandez BWC at 1:54:47–58). Plaintiff again expressed his dissatisfaction with a failure to identify arrest, claiming it is a secondary charge (Fernandez BWC at 1:55:05–11). Sergeant Fernandez agreed and told Plaintiff: "There is a curfew violation. You can't be out . . . It's, it's a city ordinance, but it's still a law" (Fernandez BWC at 1:55:13–21). Sergeant Fernandez clarified that Officers Ibarra and Jalomo considered the situation suspicious and that, during their traffic stop, they observed weapons in plain view

---

[6] Inexplicably, Officer Leal's body-worn camera footage freezes at 1:39:11 a.m. and never resumes.

5

(Fernandez BWC at 1:55:28–45). Plaintiff retorted: "Uhh, rifles," indicating he had noticeable rifles but that the handguns were supposedly hidden (Fernandez BWC at 1:55:46–47).

Following his conversation with Plaintiff, Sergeant Fernandez reapproached Officer Ibarra to clarify the various guns' whereabouts in Plaintiff's car (Fernandez BWC at 1:56:43–1:57:12). Officer Ibarra led Sergeant Fernandez to Plaintiff's car and gestured to Plaintiff's cupholder, alleging that a holstered handgun was in plain view within it (Fernandez BWC at 1:57:15–33).[7] Sergeant Fernandez explained that because the handgun was holstered but in plain view, Plaintiff was required to have a concealed carry license (Fernandez BWC at 1:58:03–08).[8]

Ultimately, Plaintiff was charged with unlawful carrying of a firearm, which the District Attorney dismissed as not available for prosecution (Dkt. No. 122 at 11). He was also cited for the COVID-19 curfew violation and failure to identify (Dkt. No. 122 at 41). The record does not reflect the disposition of those citations.

## II. PROCEDURAL HISTORY

Exactly two years after the incident, Plaintiff filed this lawsuit, asserting four claims:

- A Fourth Amendment claim against Officers Ibarra and Jalomo, and Sergeant Fernandez for false arrest, arising from Plaintiff's

---

[7] Internal Affairs subsequently investigated Plaintiff's traffic stop. After reviewing Officer Ibarra's body-worn camera footage, Internal Affairs opined "there [did] not appear to be a holstered weapon [in] the cup holder" (Dkt. No. 116 at 15, 37).

[8] In February 2021, Texas law prohibited gun owners from carrying a holstered firearm in plain view in a motor vehicle "unless the person [was] licensed to carry a handgun under Subchapter H, Chapter 411, Government Code." Act of Sept. 1, 2015, 84th Leg., R.S., ch. 437, § 11.041(a), sec. 46.02, 2015 Tex. Gen. and Spec. Laws 1706 (amended 2021) (current version at Tex. Pen. Code § 46.02(a-1)(1)). As a part of its constitutional carry reform, Texas amended this law—effective September 1, 2021—to allow gun owners to carry in that fashion if they are either over 21 years old *or* licensed to carry. § 46.02(a-1)(1).

6

> arrests for violating the COVID-19 curfew, failure to identify, and unlawful carrying;
> 
> - A Fourth Amendment claim against Officers Ibarra and Jalomo, and Sergeant Fernandez for wrongfully searching his car and seizing the weapons within it;
> 
> - A Fourth Amendment malicious prosecution claim against Officers Ibarra and Jalomo; and
> 
> - A failure to train or supervise claim against the City of Laredo, based on the purported failure to properly train and supervise its officers on detainment procedures and how to read the City's ordinance.

(*see* Dkt. No. 7). Defendants collectively moved to dismiss Plaintiff's complaint, invoking qualified immunity (*see* Dkt. No. 17). United States District Judge Diana Saldaña[9] granted in part and denied in part Defendants' motion (*see* Dkt. No. 29). She granted the City's motion, terminating it as a defendant from this action (Dkt. No. 29 at 27–31). She also granted the malicious prosecution claims against Officers Ibarra and Jalomo (Dkt. No. 29 at 26–27, 31).

Regarding the false arrest claims, Judge Saldaña granted all Defendants qualified immunity for the COVID-19 curfew violation (Dkt. No. 29 at 14–17, 30–31). The claim based on failure to identify was allowed to proceed against Officers Ibarra and Jalomo, and the claim based on unlawful carrying to proceed against Officer Ibarra (*see* Dkt. No. 29 at 17–19, 24–26). She denied all Defendants qualified immunity on the Fourth Amendment search and seizure claims arising out of the search of Plaintiff's car (Dkt. No. 29 at 19–24, 30–31). Accordingly, Plaintiff's remaining claims are as follows: (1) false arrest arising from the failure to identify

---

[9] On April 11, 2025, this case was reassigned to the Undersigned (Dkt. No. 86).

7

charge against Officers Ibarra and Jalomo; (2) false arrest arising from the unlawful carrying charge against Officer Ibarra; and (3) unreasonable search and seizure against all Defendants stemming from the search of Plaintiff's vehicle and the seizure of his firearms.

Officers Ibarra and Jalomo filed the instant motion for summary judgment on the remaining counts against them (Dkt. No. 113). Sergeant Fernandez separately filed a motion for summary judgment on the sole count against him (Dkt. No. 115).

### III.   LEGAL STANDARDS

**A. Summary Judgment**

Federal Rule of Civil Procedure 56 provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The onus then shifts to the non-moving party "to go beyond the pleadings" and establish "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted) (citing Fed. R. Civ. P. 56(e)). "When a party does not file an opposition to a motion for summary judgment, the district court is permitted to consider the facts listed in support of the

motion as undisputed and grant summary judgment if they show that the movant is entitled to judgment in his favor." *Jegart v. Roman Cath. Church of Diocese of Houma Thibodaux*, 384 F. App'x 398, 400 (5th Cir. 2010) (citing *Eversley v. MBank Dall.*, 843 F.2d 172, 174 (5th Cir. 1988)).

### B. Qualified Immunity

Qualified immunity shields government officials from § 1983 liability unless their conduct violates a constitutional right that was clearly established at the time of the alleged misconduct. *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citation omitted). Importantly, "qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (quoting *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (per curiam)).

Courts apply a two-step analysis to determine whether qualified immunity applies: (1) whether the plaintiff has alleged a violation of a constitutional right; and (2) whether the right was clearly established such that a reasonable official would have known the conduct was unlawful. *Mace*, 333 F.3d at 623–24 (citation omitted). Courts may address these prongs in any order. *Pearson*, 555 U.S. at 236.

### IV.   DISCUSSION

### A. False Arrest Claims

In his operative complaint, Plaintiff alleges the COVID-19 curfew "could not and did not apply" to him (Dkt. No. 102-1 at 8, ¶ 24). He avers that any subsequent arrest, therefore, violated his Fourth Amendment rights (Dkt. No. 102-1 at 8, ¶ 25).

All three Defendants argue to the contrary, citing Judge Saldaña's previous finding that it was reasonable to detain Plaintiff for the COVID-19 curfew violation (Dkt. Nos. 113 at 13; 115 at 13). Officers Ibarra and Jalomo advance that probable cause to arrest for the COVID-19 offense extends to the failure-to-identify and unlawful carrying arrests (Dkt. Nos. 113 at 12–14).

Officers Ibarra and Jalomo are correct. A false arrest § 1983 claim "does not cast its primary focus on the validity of each individual charge." *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995). Rather, "[i]f there was probable cause for any of the charges made . . . then the arrest was supported by probable cause, and the claim for false arrest fails." *Bailey v. Ramos*, 125 F.4th 667, 675 (5th Cir. 2025) (citing *Wells*, 45 F.3d at 95). "Probable cause 'means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Davidson v. City of Stafford*, 848 F.3d 384, 391 (5th Cir. 2017) (quoting *Hogan v. Cunningham*, 722 F.3d 725, 731 (5th Cir. 2013)), *as revised* (Mar. 31, 2017); *see also Devenpeck v. Alford*, 543 U.S. 146, 153 (2004). "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

Although the Court is unaware of any Fifth Circuit precedent directly

addressing this issue, the Ninth Circuit rejected a similar false arrest claim deriving from a COVID-19 order. In *Miller v. City of Scottsdale*, 88 F.4th 800 (9th Cir. 2023), Arizona temporarily "prohibited restaurants from offering on-site dining" outside of "pick up, delivery, and drive-thru operations." 88 F.4th at 802. Upon receiving complaints that a local proprietor was violating the order, Scottdale police officers surveilled a restaurant called Sushi Brokers. *Id.* at 803. Law enforcement personally observed "about ten people inside the establishment, of whom four left without to-go food bags." *Id.* Believing Arizona's COVID-19 order had been disobeyed, Officers arrested the owner the following day. *Id.* Affirming the district court's grant of summary judgment, the Ninth Circuit reasoned: "The probable cause inquiry turns not on whether there was a violation in fact, but on whether a reasonable officer would conclude that there was a fair probability of a violation." *Id.* at 805.

*Miller* is instructive, and it is clear Officers Ibarra and Jalomo did not infringe on Plaintiff's constitutional rights. When Plaintiff was arrested, the pandemic was at a breaking point, and the City was desperate to minimize the fallout.[10] The COVID-19 curfew, effective mere days before Plaintiff's arrest, precluded congregating[11] "in any

---

[10] *See* Julia Wallace, *Laredo Health Order Places Stricter Curfew on Gatherings for the Next Two Weekends*, Laredo Morning Times (Feb. 2, 2021), https://www.lmtonline.com/news/article/Laredo-health-order-places-stricter-curfew-on-15918127.php ("Health Authority Dr. Victor Treviño worries that gatherings around the [Super Bowl] could lead to another surge of COVID-19 in the community, just as it did following gatherings on Christmas and New Year's Eve.").

[11] At the motion to dismiss stage, Plaintiff made much of the word "congregating," contending it was impossible for him to congregate "with himself in his own vehicle in a parking lot" (Dkt. No. 27 at 9, ¶ 14). Judge Saldaña disposed of this argument, highlighting that Texas courts had not elaborated on the congregation element at the time of Plaintiff's arrest (Dkt. No. 29 at 14–15). Rather than rehash that argument, the Court adopts Judge Saldaña's analysis.

Additionally, he maintained that Governor Abbott revoked confinement as a penalty for COVID-19 violations in Executive Order GA 32, thus rendering his arrest unconstitutional (Dkt. No. 27 at 7–8, ¶¶ 12–13). *See* The Governor of the State of Tex., Relating to the Continued Response to the COVID-19 Disaster as Texas Reopens, 45 Tex. Reg. 7347, 7349 (2020). Although Judge Saldaña elected

11

area outside of an individual's household other than for engaging and seeking the services of essential or non-essential businesses" from 6:00 p.m. to 5:00 a.m. (Dkt. No. 120 at 7, 21, 29). When Officers Ibarra and Jalomo approached Plaintiff, he was not *clearly* engaged in or seeking the services of essential or non-essential businesses. He was parked in a vacant lot late at night, acted combatively, and had weapons in plain view (Dkt. Nos. 114 at 5–6, 11; 122 at 29; Fernandez BWC at 1:55:36–47). He failed to disclose that he had stopped due to low blood sugar until roughly twenty minutes after Officers Ibarra and Jalomo initiated contact (Fernandez BWC at 1:54:47– 58). Thus, even if Officers Ibarra and Jalomo were mistaken about Plaintiff's intentions, the curfew arrest was nonetheless reasonable in light of the totality of the circumstances. *Hunter*, 502 U.S. at 227 (quoting *Creighton*, 483 U.S. at 641); *Miller*, 88 F.4th at 804–05; *Grisham v. Valenciano*, 93 F.4th 903, 910 (5th Cir. 2024) (citing *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018)) (the probable cause inquiry is viewed on the objective totality of the circumstances).

Regardless, Plaintiff has not demonstrated a clearly established right to be free from arrest for a misdemeanor curfew violation during a global pandemic. Nor is the Court independently aware of any such right. *See, e.g.*, *Paz v. Hayden*, No. 24-20226,

---

not to address this argument, the Court does so briefly. Here, Plaintiff conflates an arrest with a penalty. A criminal penalty is imposed on the wrongdoer following an adjudication of guilt and usually takes the form of imprisonment or a fine. *See* Penalty(1), Black's Law Dictionary (12th ed. 2024). In contrast, an arrest is the seizure of an individual, whether by warrant or with probable cause that the individual committed a crime. *See Torres v. Madrid*, 592 U.S. 306, 311–16 (2021) (discussion about arrests); Criminal Arrest, Black's Law Dictionary (12th ed. 2024). Executive Order 32 did not bar *arrests* for COVID-19 violations— it concerned the imposition of imprisonment as a *penalty*. *See* Relating to the Continued Response to the COVID-19 Disaster as Texas Reopens, 45 Tex. Reg. at 7349. And, as the Supreme Court has made clear, law enforcement may constitutionally arrest "an individual [that] has committed even a very minor criminal offense in [their] presence" so long as they have probable cause. *Atwater*, 532 U.S. at 354.

12

2025 WL 1604508, at *3 (5th Cir. June 6, 2025) (quoting *Elder v. Holloway*, 510 U.S. 510, 516 (1994)). To the contrary, if they have probable cause to believe even a *minor* offense has been committed in their presence, police officers may lawfully arrest the offender. *Atwater*, 532 U.S. at 354. Accordingly, Plaintiff has not pointed "to evidence establishing 'a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law.'" *Paz*, 2025 WL 1604508, at *3 (quoting *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017)).

Because probable cause to arrest for the curfew offense extends to the subsequent arrests, the Court finds that Officers Ibarra and Jalomo are plainly entitled to qualified immunity and **GRANTS** their motion for summary judgment as to the false arrest claims (Dkt. No. 113). *Bailey*, 125 F.4th at 675 (citing *Wells*, 45 F.3d at 95).

## B. Search and Seizure Claim

Plaintiff challenges the warrantless search of his car and the seizure of his firearms and ammunition "because there was no probable cause of any crime" (Dkt. No. 102-1 at 9, ¶ 28). Officers Ibarra and Jalomo rebuff Plaintiff's claim by raising the community caretaking exception to warrantless searches (Dkt. No. 113 at 14–16). Sergeant Fernandez presents both the community caretaking and protective sweep exceptions (Dkt. No. 115 at 13–14). Defendants' arguments persuade the Court, and the Court begins with the protective sweep exception.

### 1. *Protective Sweeps Under* Michigan v. Long

"During an investigatory stop, officers may make protective sweeps of the immediate area 'as a precautionary matter.'" *Davila v. United States*, 713 F.3d 248,

259 (5th Cir. 2013) (quoting *Maryland v. Buie*, 494 U.S. 325, 334 (1990)). "[A] protective sweep for weapons during a traffic stop is justified where the officers reasonably believe that someone within police custody might gain access to weapons, either during the traffic stop or once they are returned to their vehicles." *Id.* (citing *Michigan v. Long*, 463 U.S. 1032, 1048 (1983)). To avail themselves to the *Long* exception, officers must have reasonable suspicion that: (1) the individual is dangerous; and (2) the individual may gain immediate control of a weapon. *Long*, 463 U.S. at 1049–50; *Estep v. Dallas County*, 310 F.3d 353, 358 (5th Cir. 2002).

The case of *Davila v. United States*, 713 F.3d 248 (5th Cir. 2013) provides valuable guidance. There, law enforcement had be-on-the-lookout for one of the plaintiffs' cars, as it had been associated with a known criminal at large. 713 F.3d at 253–54. When law enforcement saw the vehicle in Big Bend National Park, they ordered both plaintiffs and a child out of it, handcuffed them, and forced them to kneel on the ground—all with their guns drawn. *Id.* at 254. All three individuals remained handcuffed while law enforcement searched the car. *Id.* Justifying the search on the protective sweep exception, the Fifth held the search was reasonable because a fugitive *might* have weapons in their car. *Id.* at 259.

Here, the undisputed facts present an even stronger case than *Davila*. At a *minimum*, Officers Ibarra and Jalomo had reasonable suspicion that Plaintiff was dangerous upon initial contact. *Id.* (finding a protective sweep justified because the rangers "had reasonable suspicion that a fleeing felon might . . . have weapons in the vehicle"); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citations omitted) (reasonable suspicion is "considerably less" than preponderance of the evidence and

14

"obviously less demanding than . . . probable cause"). Several long rifles were plainly visible through the windows of Plaintiff's vehicle, and Plaintiff divulged he had "plenty" of other weapons on him (Dkt. No. 114 at 6; Fernandez BWC at 1:55:46–47 (Plaintiff admitted rifles were plainly visible in his car); Plaintiff's Footage at 2:29–:31). Plaintiff was recalcitrant throughout the encounter—especially concerning his earlier whereabouts and identity (Plaintiff's Footage at 0:15–2:11). *United States v. Larremore*, 150 F.4th 463, 475 (5th Cir. 2025) ("Inconsistent and nonsensical answers can create reasonable suspicion."). And the interaction occurred at nearly two o'clock in the morning when "the overwhelming majority of law-abiding citizens are at home in bed." *United States v. Michelletti*, 13 F.3d 838, 845 (5th Cir. 1994) (en banc) (DeMoss, J., concurring); *see also Alexander v. City of Round Rock*, 854 F.3d 298, 304 (5th Cir. 2017) (unusual activity considering the time of day may be a factor in reasonable suspicion). Plaintiff's alarming behavior, combined with the late hour and the visible presence of firearms in his vehicle, created a legitimate concern for officer safety.[12] *Long*, 463 U.S. at 1050 ("[R]oadside encounters between police and suspects are especially hazardous.").

Further, that Plaintiff was handcuffed within two minutes has no bearing on whether he may have gained immediate access to weapons (Plaintiff's Footage at 2:11–13). The Fifth Circuit has unequivocally held that "the fear of a person's gaining immediate control of weapons . . . extends through the entire interaction between

---

[12] In a conversation with Sergeant Fernandez, Officer Ibarra alleged Plaintiff's weapons were not initially a concern (Fernandez BWC at 1:56:46–50). This statement is of no consequence, as "there is no legal requirement that an officer subjectively fear for his own safety before engaging in . . . a [protective] search." *Wallen*, 388 F.3d at 167. Instead, the inquiry turns on whether police would *objectively* fear for officers' safety under the totality of the circumstances. *See United States v. Baker*, 47 F.3d 691, 693–94 (5th Cir. 1995) (collecting cases).

15

him and the officer." *United States v. Wallen*, 388 F.3d 161, 166 (5th Cir. 2004). Consequently, a handcuffed suspect "can remain a danger to the police, *particularly when weapons are present.*" *Id.* (emphasis added) (citing *United States v. Sanders*, 994 F.2d 200, 208–10 (5th Cir. 1993)); *see also Davila*, 713 F.3d at 254, 259 (finding a protective sweep constitutional when the suspects where handcuffed and kneeling on the ground throughout it). When Officer Ibarra commenced searching Plaintiff's car, Plaintiff was not formally under arrest, and, thus, the possibility he would return to his car and retrieve a weapon persisted (Plaintiff's Footage at 2:43–3:18). Finally, Officer Ibarra's protective sweep was restricted to the car's driver's seat, passenger's seat, and backseat—"areas to which [Plaintiff] would generally have immediate control, and that could contain a weapon" (Plaintiff's Footage at 2:43–3:13). *Long*, 463 U.S. at 1050.

At bottom, Officers Ibarra and Jalomo conducted a constitutional protective sweep of Plaintiff's vehicle. *See Davila*, 713 F.3d at 259. Therefore, they are entitled to qualified immunity, and the Court **GRANTS** their motion for summary judgment in that regard (Dkt. No. 113). *See Mace*, 333 F.3d at 623–24 (to survive qualified immunity, a plaintiff must establish a violation of a constitutional right).

### 2. *Community Caretaking*

Whether the community caretaking exception applies to a warrantless seizure and search of a vehicle is essentially a two-fold analysis: (1) Did law enforcement constitutionally impound the vehicle?; and (2) Did law enforcement thereafter conduct a constitutionally valid inventory search? *South Dakota v. Opperman*, 428 U.S. 364, 368–69 (1976); *United States v. McKinnon*, 681 F.3d 203, 207–09 (5th Cir.

2012).

### i.     Impounding the Vehicle

Law enforcement "may impound vehicles in furtherance of public safety or community caretaking functions." *Degenhardt v. Bintliff*, 117 F.4th 747, 756 (5th Cir. 2024) (citation modified) (quoting *Opperman*, 428 U.S. at 368–69). "In considering whether this exception applies, [the Court's] constitutional analysis hinges upon the reasonableness of the 'community caretaker' impound viewed in the context of the facts and circumstances encountered by the officer." *Id.* (quoting *McKinnon*, 681 F.3d at 208). For example, "[w]hen a driver is arrested, the police need to get the vehicle off the road so that it does not impede traffic or jeopardize public safety and to protect the vehicle itself." *Id.* at 756–57 (first citing *Opperman*, 428 U.S. at 368–69; and then citing *McKinnon*, 681 F.3d at 208–09).

Here, Sergeant Fernandez justifies the officers' decision to impound Plaintiff's car on the public safety rationale, advancing that "leaving the vehicle unattended and filled with loaded weapons and ammunition would jeopardize public safety" (Dkt. No. 115 at 16). The Court agrees, and further finds it significant that the encounter took place in the dead of night, in an otherwise deserted parking lot, and amid a time of uncertainty. Given the time of night and COVID-19 climate, few—if any—businesses would have been open in the area. Plaintiff's car easily could have been burglarized without any eyewitnesses, potentially placing his weapons and ammunition in the hands of unknown individuals. Indeed, the Fifth Circuit has found impounds passed constitutional muster for *far* less. *See United States v. Staller*, 616 F.2d 1284, 1290 (5th Cir. 1980) ("[A] car parked overnight in a mall parking lot runs an appreciable

17

risk of vandalism or theft."); *United States v. Ponce*, 8 F.3d 989, 996 (5th Cir. 1993) (finding reasonable the impoundment of a truck in a "public parking lot where it could have become a nuisance, and where it could have been damaged or stolen").

    ii.  Inventorying the Car

To be constitutionally valid, an inventory search must be "conducted pursuant to standardized regulations and procedures that are consistent with (1) protecting the property of the vehicle's owner, (2) protecting the police against claims or disputes over lost or stolen property, and (3) protecting the police from danger." *McKinnon*, 681 F.3d at 209 (quoting *United States v. Lage*, 183 F.3d 374, 380 (5th Cir. 1999)). Courts have imposed an additional requirement that the inventory search cannot be evidentiary in disguise. *Castro v. Kory*, No. 23-50268, 2024 WL 1580175, at *4 (5th Cir. Apr. 11, 2024) (first citing *Wells*, 495 U.S. at 4–5; and then citing *United States v. Como*, 53 F.3d 87, 92 (5th Cir. 1995)).

Within its manual, the Laredo Police Department sets forth its standardized procedures for inventory searches (Dkt. No. 120 at 4–5). The Court accepts Defendants' uncontroverted representation that the inventory search adhered to the Department's standardized procedures (Dkt. Nos. 114 at 7, 11). *Jegart*, 384 F. App'x at 400 (citing *Eversley*, 843 F.2d at 174). Moreover, the Court independently finds the same. An inventory form was executed, and the tow truck operator acknowledged it (Dkt. Nos. 118 at 8–9; 120 at 4). Officer Leal's body-worn camera footage was activated throughout the inventory process (Leal BWC at 1:36:32–1:39:11).[13]

---

[13] As previously noted, Officer Leal's footage freezes at 1:39:11 a.m. The Court has no basis to infer that the interruption was caused by deactivation rather than by a malfunction or technical issue. Notably, Plaintiff has not argued otherwise.

18

Additionally, the policy itself is constitutionally sound. It alleges: "These inventory procedures are for the purpose of protecting the vehicle owner's property, providing for the safety of department members[,] and protecting the Department against fraudulent claims of lost, stolen or damaged property" (Dkt. No. 120 at 5). That is nearly verbatim to a purpose statement that the Fifth Circuit previously held adequate. *See McKinnon*, 681 F.3d at 210 ("By its clear terms, the policy is consistent with preserving the property of the vehicle's owner, ensuring that the police protect themselves against claims or disputes over lost or stolen property, and protecting the police from danger."). The policy also imposes limits designed to restrain law enforcement from exercising unfettered power, including requiring activation of body-worn cameras and generally prohibiting the opening of closed containers (Dkt. No. 120 at 4).

Lastly, as Sergeant Fernandez points out, "[n]one of the weapons discovered as a result of the search were used to bring additional charges against [Plaintiff]" (Dkt. No. 115 at 18). Plaintiff's vehicle was properly impounded, and the Officers prepared a valid inventory log (Dkt. Nos. 114 at 40; 118 at 8–9). Thus, the record does not support the conclusion that the search was conducted solely for evidentiary purposes. *Contra Castro*, 2024 WL 1580175, at *4 (finding a search was evidentiary because the officers did not create an inventory log, called a canine unit to the scene, and never actually impounded the truck).

In sum, the community caretaking function warrants the continued search of Plaintiff's car and the seizure of his belongings, such as his firearms and ammunition. All three Defendants are entitled to qualified immunity on Plaintiff's related Fourth

19

Amendment claim. *Mace*, 333 F.3d at 623–24 (to survive qualified immunity, a plaintiff must establish a violation of a constitutional right). Accordingly, the Court **GRANTS** Officers Ibarra and Jalomo's motion for summary judgment (Dkt. No. 113) and Sergeant Fernandez's motion for summary judgment (Dkt. No. 115).

## V.    CONCLUSION

For the foregoing reasons, Officers Ibarra and Jalomo are entitled to qualified immunity on Plaintiff's false arrest claim and unreasonable search and seizure claim. Sergeant Fernandez is entitled to qualified immunity on Plaintiff's unreasonable search and seizure claim. The Court **GRANTS** Officers Ibarra and Jalomo's Motion for Summary Judgment (Dkt. No. 113) and Sergeant Fernandez's Motion for Summary Judgment (Dkt. No. 115).

Because the Court did not rest its decision on Plaintiff's alleged failure to respond to Sergeant Fernandez's Requests for Admissions, Plaintiff's Motion for Withdrawal of Admission Pursuant to FRCP 36(b) (Dkt. No. 126) is **DENIED AS MOOT**.

It is **ORDERED** that Plaintiff shall take nothing in this case against Defendants. The Clerk of Court is **DIRECTED** to **TERMINATE** this civil action. The Court will enter final judgment pursuant to Federal Rule of Civil Procedure 58 under separate cover.

It is so **ORDERED**.

**SIGNED** November 13, 2025.

Marina Garcia Marmolejo
United States District Judge